UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE C. WELLS,<br><br>    Plaintiff,<br><br>v.<br><br>MENDOCINO COUNTY SHERIFF'S OFFICE, et al.,<br><br>    Defendants. | Case No. 19-01345 EJD (PR)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br><br>(Docket No. 29) |

Plaintiff, a pretrial detainee at the time of the events underlying this action, filed a pro se civil rights complaint under 42 U.S.C. § 1983, against the Mendocino County Sheriff's Office and its employees. Dkt. Nos. 1, 20.[1] The Court found the complaint stated cognizable claims and ordered the matter served on Defendants Sgt. Siderakis, Sgt. Johnston,[2] Deputy Grant, Capt. Timothy Pearce,[3] Sgt. Saye, Deputy Leon, and Deputy

---

[1] Plaintiff later filed an amendment to the complaint, to provide additional facts in support of his claim. Dkt. No. 20. Accordingly, the operative complaint in this matter is comprised of the documents filed under Docket Nos. 1 and 20. See Dkt. No. 27 at 2.

[2] Plaintiff originally identified this defendant as "Johnson," but Defendants' summary judgment motion indicates that the proper spelling is "Johnston." Dkt. No. 29 at 5.

[3] Plaintiff originally identified this defendant as "Pierce," but Defendants' summary

Case. Dkts. No. 13, 27. Defendants have filed a motion for summary judgement on the grounds that Plaintiff failed to exhaust administrative remedies and also on the grounds that Plaintiff's rights were not violated.[4] Dkt. No. 29. Plaintiff filed opposition, Dkt. No. 39, and Defendants filed a reply, Dkt. No. 40.[5]

For the reasons discussed below, Defendants' motion for summary judgment is **GRANTED**.

## DISCUSSION

I. **Statement of Facts**[6]

Plaintiff was in the custody of the Mendocino County Jail ("MCJ") from March 2, 2017, after his arrest based on a warrant, until December 13, 2018. Bednar Decl. ¶ 3. Plaintiff was one of seven individuals arrested and charged in connection with a homicide that occurred in Laytonville, California. Id. Plaintiff eventually pled guilty to charges and was sentenced to three years in state prison on November 16, 2018. Id., Dkt. No. 29-1 at 59.

This action is based on Plaintiff's claim that "against [his] protests and pleas and citations of evidence," Defendants at MCJ ordered several cell moves during July and

---

judgment motion indicates that the proper spelling is "Pearce." Dkt. No. 29 at 5.

[4] In support of their motion, Defendants submit the following: declaration of Defendant Sgt. Sotiris Siderakis, Dkt. No. 29-1 at 1-2, along with copies of classification reviews he prepared involving Plaintiff, (Ex. A-SS), id. at 3-24; declaration of Defendant Deputy Michael Grant, id. at 25-26, along with copies of classification reviews he prepared involving Plaintiff, (Ex. A-MG), id. at 27-45, and an inmate request form he responded to, (Ex. B-MG), id. at 46-47; declaration of non-party Lt. John Bednar, id. at 48-52, along with exhibits, id. at 53-107; declaration of Defendant Sgt. Eldon Johnston, id. at 108-109; declaration of Defendant Timothy Pearce, id. at 110-111; declaration of Defendant Filipe Leon, id. at 112-113, along with exhibits, id. at 114-116; declaration of Defendant Deputy Aohoovaan Case, id. at 117-118; and declaration of Defendant Sgt. Phil Saye, id. at 119-120.

[5] In reply, Defendants first object to Plaintiff's opposition as being untimely because the Plaintiff's opposition was filed one day after the deadline of February 1, 2021. Dkt. No. 40 at 2. However, in the interest of justice, the Court will not count the delay of one day against Plaintiff as he is pro se and currently in a residential treatment program.

[6] The following facts are undisputed unless otherwise indicated.

August 2017, attempting to house Plaintiff with two hostile co-defendants who had "turned state evidence against" him. Dkt. No. 1 at 3; Dkt. No. 1-1 at 1; Dkt. No. 20 at 1. Plaintiff identifies the two co-defendants as "A.Said Mohammed and Gary 'Cricket' Blank." Dkt. No. 1-1 at 1. Plaintiff claims that these co-defendants had threatened his life because he could "possibly put them at the murder scene." Id. Plaintiff claims these cell moves caused him harm "through an onslaught of harassment, assault and battery and psychological warfare that potentially jeopardized [his] life and the lives of others." Dkt. No. 1 at 3. Plaintiff also states that he told Defendants that he did not want to be housed "with violent people" like Caleb Silver who was a convicted murderer and had 6 previous fights. Dkt. No. 1-1 at 2. Plaintiff states that during the year he was housed with Silver, he "defended [himself] skillfully from being battered 9 times." Id.; Dkt. No. 20 at 6-7.

Based on Plaintiff's allegations, the Court found the complaint stated a cognizable claim based on Defendants' failure to protect Plaintiff from violence at the hand of other prisoners. Dkt. No. 11 at 3, citing Farmer v. Brennan, 511 U.S. 85, 833 (1994). The briefs in this matter indicate that Plaintiff was a pretrial detainee for the majority of time that he was housed at MCJ. Accordingly, Plaintiff's failure to protect claim is cognizable under the Fourteenth Amendment due process clause rather than the Eighth Amendment. See infra at 13.

### A.   Initial Classification

MCJ is a small jail with many inmates who have legitimate safety reasons for not mixing with particular inmates or any other inmates at all. Bednar Decl. ¶ 11. Accordingly, an inmate's refusal to house with other inmates, without legitimate safety and security concerns, places a significant burden on MCJ, so that inmates are disciplined for such refusals. Pearce Decl. ¶ 2.

Plaintiff told MCJ staff during his initial classification review on March 6, 2017, that he did not want to mix with co-defendant Zachary Wuester. Siderakis Decl., Ex. A-SS, Dkt. No. 29-1 at 22. Plaintiff also indicated concerns regarding co-defendant Gary

3

Fitzgerald. Bednar Decl. ¶ 6. He did not express concerns about being housed with any other co-defendant at that time. Id. Consequently, with Plaintiff having expressed concerns only regarding housing with co-defendants Wuester and Fitzgerald, MCJ staff attempted to place Plaintiff in a cell with other inmates. Id. at ¶ 11. According to Defendants, Plaintiff was never housed with any inmate with whom he refused to be housed or even placed in the same shower group. Id. at ¶ 7; Grant Decl. ¶¶ 3-4. Plaintiff was also never housed with an inmate whom MCJ staff believed would harm Plaintiff. Bednar Decl. ¶ 7; Pearce Decl. ¶ 3.

### B. Housing with Co-Defendants

During his time at MCJ, Plaintiff was housed with only one co-defendant, Mr. Abdirahman Mohamed, whom Plaintiff did not identify as a danger at the initial classification review. See supra at 3; Bednar Decl. ¶ 5, Ex. D-JB, Dkt. No. 29-1 at 77-78. Plaintiff was housed with Mr. Mohamed from March 29, 2017 through April 16, 2017, and the two had no altercations while housed together. Bednar Decl. ¶ 5, Ex. D-JB, Dkt. No. 29-1 at 77-78; Siderakis Decl. ¶ 2; Dkt. No. 29-1 at 21; Saye Decl. ¶ 2. The two remained in the same yard group even after they were no longer cellmates, and Plaintiff reported that they got along. Siderakis Decl. ¶ 2, Docket No. 29-1 at 19. According to Plaintiff, Mr. Mohamed had requested the cell move "because it wasn't working out between us 'due to [Mr. Mohamed's] involvement with the D.A. in the case.'" Dkt. No. 20 at 4.

On April 29, 2017, a couple of weeks after the two were separated, Plaintiff requested to be in the same shower group with Mr. Mohamed, and his request was granted. Docket No. 29-1 at 20. While in the shower group with Mr. Mohamed, Plaintiff continued to report that the two got along. Grant Decl., Ex. A-MG, Dkt. No. 29-1 at 43-44. On June 16, 2017, Plaintiff complained when his shower group, which included Mr. Mohamed, was disassembled, and he requested an explanation. Bednar Decl. ¶ 9, Ex. E-JB, Dkt. No. 29-1 at 80. Defendant Saye's written response on June 19, 2017, stated that Mr. Mohamed had asked to be separated. Dkt. No. 29-1 at 80.

4

During July and August of 2017, when Plaintiff was housed in a cell by himself, Defendant Pearce ordered Plaintiff to be placed on a "move list" with Mr. Mohamed and Gary Blank, another co-defendant, due to limited space. Siderakis Decl. ¶ 4; Bednar Decl. ¶ 11. Prior to placing the inmates together, Defendants Siderakis and Grant spoke with all three inmates, none of whom stated that they would get into a fight with any of the others or that they feared for their life if housed with each other. Siderakis Decl. ¶ 4. Mr. Blank agreed to house with both of the others, Mr. Mohamed agreed only to house with Plaintiff, and Plaintiff would not agree to house with either of them. Id. Plaintiff was written up and disciplined for his refusal because MCJ staff believed that Plaintiff was attempting to manipulate his housing to keep his own cell. Id. ¶ 5; Bednar Decl. ¶ 11; Pearce Decl. ¶ 4. This belief was based on Plaintiff's expressing concerns about housing with other inmates but only once he was asked to house with the inmate. Bednar Decl. ¶ 11. Furthermore, on July 31, 2017, MCJ staff intercepted a call between Plaintiff and a family member, during which Plaintiff stated that he would refuse to house with any other inmate, even if he liked the inmate, because he wanted his own cell. Id., Ex. F-JB, Dkt. No. 29-1 at 84-87; Siderakis Decl. ¶ 3. Even so, Plaintiff was not forced to house with any inmate with whom he refused to be housed. Bednar Decl. ¶ 7; Grant Decl. ¶¶ 3-4.

With respect to Gary Blank, Plaintiff was never placed in the same cell with Mr. Blank although the two were in the same wing of the jail. Bednar Decl. ¶ 5. Plaintiff was never out of his cell at a time when Mr. Blank was out of his cell, and at all times there was a physical barrier between them. Id. Once on May 29, 2017, Plaintiff requested that Mr. Blank be moved to a different cell because Mr. Blank made a slashing motion across his throat. Grant Decl. ¶ 5, Dkt. No. 29-1 at 43. The request was denied, and Plaintiff was told not to look into Mr. Blank's cell. Id.

Mr. Mohamed is next mentioned in a classification review report dated November 5, 2018, written by Defendant Grant. Dkt. No. 29-1 at 28. The report noted that although Plaintiff had been scheduled for sentencing the previous Friday, the matter was delayed

5

because his attorney had not yet received the probation report. Id. The report noted that this was a possible "stall tactic" by the attorney because all of Plaintiff's co-defendants had been sentenced. Id. Defendant Grant wrote that Defendant Sgt. Saye showed him a memo written by Plaintiff's attorney claiming Mr. Mohamed had put money on other inmates' accounts in order to put a hit on Plaintiff. Id. Defendant Grant wrote that he told Defendant Saye "this was funny because there were reports written by Mohamad claiming the same thing." Id.

On November 21, 2018, Defendant Siderakis wrote a classification review report also mentioning a letter written by Plaintiff's attorney stating that Mr. Mohamed had been putting money on several inmates' books in order to put a "hit" on Plaintiff, and that this has been on ongoing issue between them. Dkt. No. 29-1 at 4. Defendant Siderakis noted that Plaintiff had been sentenced five days earlier on November 16, 2018, to three years in "CDC." Id.

### C. Housing with Inmate Caleb Silver

After refusing to be housed with another cellmate and being disciplined for it, Plaintiff eventually agreed to house with inmate Caleb Silver on August 9, 2017; all discipline he had received was suspended. Pearce Decl. ¶ 5; Siderakis Decl. ¶ 5, Dockt No. 29-1 at 15; Grant Decl. ¶ 6, Dkt. No. 29-1 at 47. The two were housed together from August 10, 2017 through July 19, 2018. Bednar Decl. ¶ 5, Dkt. No. 29-1 at 77-78. Both inmates were being held on attempted murder charges and were not convicted for most of the time they were housed together. Bednar Decl. ¶ 12. While housed with Mr. Silver, Plaintiff consistently expressed that the two got along well. Grant Decl. ¶ 7, Ex. A-MG, Dkt. No. 29-1 at 36, 38-39, 41; Siderakis Decl. ¶ 5, Ex. A-SS at Dkt. No. 29-1 at 6-8, 10-11, 14-15, 24. The only incident between Silver and Plaintiff was a roughhousing incident on June 28, 2018, for which both were disciplined. Bednar Decl. ¶ 12, Ex. G-JB, Dkt. No. 29-1 at 105-107. Both inmates claimed they were horse-playing and requested to remain housed together. Id.; Saye Decl. ¶ 4.

6

According to Plaintiff, Mr. Silver told him on August 21, 2017, that Mr. Mohamed had paid him via the commissary account to "stab [Plaintiff] up," but that Mr. Silver had welched on the deal and just kept the money. Dkt. No. 20 at 7.

### D.   Altercation with Inmate Mark Burleigh

On July 12, 2017, Plaintiff got into an altercation with inmate Mark Burleigh. Dkt. No. 29-1 at 42. Plaintiff and Burleigh had no prior history of fighting prior to the time of the altercation. Leon Decl. ¶ 3; Johnston Decl. ¶ 3. On July 11, 2017, just the day before the incident, Plaintiff had reported getting along with Mr. Burleigh and two other inmates during a classification interview. Siderakis Decl., Dkt. No. 29-1 at 17.

According to Plaintiff, he separately informed Defendants Leon, Case, and Johnston on July 9, 2017, about a potential altercation with Mr. Burleigh if they remained in the same shower group. Dkt. No. 1-1 at 1. Plaintiff claims when he told Defendant Leon that he was worried about a potential altercation with Mr. Burleigh, Defendant Leon responded, "I don't know Wells, I'd kinda like to see that fight." Dkt. No. 20 at 2. Plaintiff claims that when he told Defendant Case the same thing later that day, Defendant Case instructed him to "tell the sargeant [*id*]." Id. That evening, when Plaintiff told Defendant Sgt. Johnston about his "bad feelings" over Mr. Burleigh being in his shower group, Defendant Johnston "with a shrug of his shoulders said, 'Ignore him,' as he walked away." Id. at 3.

According to Defendant Johnston, Plaintiff told him that Burleigh had been talking about Plaintiff's case and he thought Burleigh was weird. Johnston Decl. ¶ 2. Plaintiff did not tell Defendant Johnston anything that made him believe that Burleigh would be a threat to Plaintiff. Id. When Defendant Johnston specifically asked Plaintiff whether Burleigh had ever threatened him, Plaintiff said, "'No, he's just weird.'" Id. According to Defendant Leon, he never told Plaintiff that he would like to see him and Burleigh fight, and nothing Plaintiff said to him caused Defendant Leon to be concerned that Burleigh might pose a safety risk to Plaintiff. Leon Decl. ¶ 2. According to Defendant Case, he

7

never told Plaintiff that he would like to see him fight. Case Decl. ¶ 2.

With respect to the altercation, Plaintiff alleges that while his back was turned, he was attacked by Mr. Burleigh who punched him "7x" to the face until he fell down. Dkt. No. 1-1 at 1; Dkt. No. 20 at 3. According to the incident report prepared by Defendant Leon, he was conducting "Ad/Seg group showers" in Wing 4 for Plaintiff's group and was in the lower tier with one of the inmates refreshing the mop bucket. Dkt. No. 29-1 at 115. Defendant Leon heard a commotion coming from the upper tier, looked up and saw two inmates engaged in mutual combat. Id. He placed a call over the radio for a fight in Wing 4 and responded to the upper tier. Id. He called several times for Plaintiff and Burleigh to stop fighting, but the inmates did not desist. Id. The inmates continued to fight even after Defendant Leon deployed three rounds of OC spray. Id. at 116. Only after other staff arrived did the inmates stop fighting and lie face down on the floor. Id. Mr. Burleigh later admitted that he was the first to hit Plaintiff, because he was "fed-up with the entire name-calling over the last several days." Id.

### E.   Inmate Grievance

During his time at MCJ, Plaintiff submitted one accepted grievance on August 2, 2017, regarding his housing. Bednar Decl. ¶ 4, Ex. B-JB, Dkt. No. 29-1 at 61-70. Plaintiff did not take this grievance past the first level, to the two levels of appeal after the initial response. Id. Plaintiff filed other housing related grievances which were duplicative of the first and were therefore rejected pursuant to Sheriff's office policy No. 607.00 – Inmate Grievance Procedure. Id., Ex. C-JB, Dkt. No. 29-1 at 72-75.

## II.   Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof

8

at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  See Celotex Corp., 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted.  See Liberty Lobby, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citations omitted).  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Id. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact.  See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence presented and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  See id. at 631.  The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  If the nonmoving party

fails to do so, the district court may properly grant summary judgment in favor of the moving party. See id.

### A.     Exhaustion

The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory and no longer left to the discretion of the district court. Woodford v. Ngo, 548 U.S. 81, 84 (2006) (citing Booth v. Churner, 532 U.S. 731, 739 (2001)). "Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards." Id. Even when the relief sought cannot be granted by the administrative process, i.e., monetary damages, a prisoner must still exhaust administrative remedies. Id. at 85-86 (citing Booth, 532 U.S. at 734).

The PLRA's exhaustion requirement requires "proper exhaustion" of available administrative remedies. Id. at 93. An action must be dismissed unless the prisoner exhausted his available administrative remedies before he or she filed suit, even if the prisoner fully exhausts while the suit is pending. McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002). Compliance with prison grievance procedures is all that is required by the PLRA to "properly exhaust." Jones v. Bock, 549 U.S. 199, 217-18 (2007). The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. Id. at 218.

Failure to exhaust under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (PLRA), is "an affirmative defense the defendant must plead and prove." Jones v. Bock, 549 U.S. 199, 204, 216 (2007). Defendants have the burden of raising and proving the absence of exhaustion, and inmates are not required to specifically plead or demonstrate exhaustion in their complaints. Id. at 215-17. In the rare event that a failure to exhaust is

clear on the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Albino v. Baca, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc).[7]

      The defendant's burden is to prove that there was an available administrative remedy and that the prisoner did not exhaust that available administrative remedy. Id. at 1172; see id. at 1176 (reversing district court's grant of summary judgment to defendants on issue of exhaustion because defendants did not carry their initial burden of proving their affirmative defense that there was an available administrative remedy that prisoner plaintiff failed to exhaust); see also Brown v. Valoff, 422 F.3d 926, 936-37 (9th Cir. 2005) (as there can be no absence of exhaustion unless some relief remains available, movant claiming lack of exhaustion must demonstrate that pertinent relief remained available, whether at unexhausted levels or through awaiting results of relief already granted as result of that process). Once the defendant has carried that burden, the prisoner has the burden of production. Albino, 747 F.3d at 1172. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. Id. But as required by Jones, the ultimate burden of proof remains with the defendant. Id.

      Defendants first argue that Plaintiff failed to exhaust administrative remedies with respect to the claims against them because Plaintiff never took his grievance past the first level, through the two levels of appeal. Dkt. No. 29 at 10. Defendants assert, therefore, that Plaintiff did not exhaust all available administrative remedies. Id. Plaintiff's opposition is silent with respect to Defendants' exhaustion argument. Dkt. No. 39. In reply, Defendants assert that Plaintiff has failed to provide through declaration or other

---

[7] In Albino, the Ninth Circuit, sitting en banc, overruled Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003), which held that failure to exhaust available administrative remedies under the PLRA, should be raised by a defendant as an unenumerated Rule 12(b) motion. Albino, 747 F.3d at 1166. "[A] failure to exhaust is more appropriately handled under the framework of the existing rules than under an 'unenumerated' (that is, non-existent) rule." Id.

11

admissible evidence that he exhausted administrative remedies. Dkt. No. 40 at 3.

Viewing the undisputed evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff failed to properly exhaust administrative remedies for the claims raised in this matter. The Mendocino County Sheriff's Office "Inmate Grievance Procedure" sets forth the procedures for inmates to complain of various conditions of confinement. Bednar Decl., Ex. C-JB, Dkt. No. 29-1 at 72-75. The procedures describe three levels of administrative remedies if a grievance matter cannot be resolved at an informal level through oral discussion. Id. at 72. Then the inmate can submit the matter in writing by using an inmate grievance form to "Level I." Id. at 73. If the inmate is dissatisfied with the Level I resolution the grievance can be appealed to the next level, "Level II," and if still dissatisfied, then to the final "Level III," which is the final administrative remedy available. Id. Defendants have submitted a copy of Plaintiff's grievance in this matter, which Plaintiff does not dispute, and it clearly shows that Plaintiff did not submit the grievance to the second and third levels of review. Dkt. No. 29-1 at 61-62. Accordingly, Defendants have carried their burden of demonstrating that there were available administrative remedies remaining to Plaintiff, and that he did not exhaust those available remedies. Albino, 747 F.3d at 1172. The burden therefore shifted to Plaintiff to come forward with evidence showing that there was something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him. Id. Plaintiff has failed to do so.

Based on the foregoing, Defendants have shown that Plaintiff failed to properly exhaust all available administrative remedies with respect to the claims raised in this action. Plaintiff has failed in opposition to show that there was something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him or that he was incapable of filing a timely appeal. Albino, 747 F.3d at 1172. Accordingly, Defendants are entitled to summary judgment under Rule 56 based on Plaintiff's failure to exhaust administrative remedies. Id. at 1166.

12

Nevertheless, because Defendants have also answered on the merits of the Fourteenth Amendment claims against them and Plaintiff has responded, the Court will proceed with an analysis of the claims. As discussed below, Defendants are also entitled to judgment as a matter of law for lack of a genuine dispute as to any material fact.

**B.     Failure to Protect**

Inmates who sue prison officials for damages for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause. See Bell v. Wolfish, 441 U.S. 520, 535 (1979); Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc). But under both clauses, the inmate must show that the prison official acted with deliberate indifference. Castro, 833 F.3d at 1068.

In the context of claims for failure to protect, the standard under the Eighth Amendment to prove deliberate indifference is different than the standard to prove deliberate indifference under the Fourteenth Amendment. Whereas a convicted prisoner must prove an individual defendant's subjective awareness of a risk of harm in order to prevail on a failure-to-protect claim under the Eighth Amendment, a pretrial detainee need not do the same in order to prevail on a failure-to-protect claim under the Fourteenth Amendment. Id. at 1068-70 (holding that objective standard of Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015), applicable to excessive force claims brought by pretrial detainees, also applies to failure-to-protect claims brought by pretrial detainees). Specifically, a pretrial detainee need not "prove an individual defendant's subjective intent to punish in the context of a . . . failure-to protect claim." Id. at 1070. A pretrial detainee who asserts a due process claim for failure to protect instead must prove "more than negligence but less than subjective intent – something akin to reckless disregard." Id. at 1071.

The elements of a pretrial detainee's due process failure-to-protect claim against an individual officer are: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at

13

substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved -- making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries. Id. (footnote omitted). With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case. Id. (citing Kingsley, 135 S. Ct. at 2473).

Plaintiff's failure to protect claim is based on Defendants' actions with respect to the following: (1) housing him with co-defendants; (2) housing him with Mr. Silver; and (3) the altercation with Mr. Burleigh. The Court addresses each of these claims below.

### 1. Housing with Co-Defendants

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine dispute as to any material fact relating to Plaintiff's claim that Defendants failed to protect him when they housed him with co-defendants. It is undisputed that the only co-defendant that Plaintiff was housed with during his time at MCJ was Mr. Mohamed. See supra at 4-5. However, the undisputed evidence shows that Plaintiff fails to satisfy all the elements for a failure to protect claim from Mr. Mohamed against any named Defendant.

First with respect to the first element, it is undisputed that Defendants made an intentional decision to house Plaintiff with Mr. Mohamed from March 29, 2017 through April 16, 2017. Id. at 4. However, there is no evidence to support the second element, i.e., that housing Plaintiff with Mr. Mohamed during this 2 to 3 week period put him at substantial risk of suffering serious harm. For the first time in opposition, Plaintiff asserts that Sgt. Bohner, a non-party, was made aware at the Ukiah Jail intake that Plaintiff did not want to be housed with *any* co-defendants. Dkt. No. 39 at 3. Plaintiff asserts that he did not know all their names "or even who they all are," but that "Custody" knew the name of

14

all his co-defendants, including Mr. Mohamed. Id. at 4. He asserts, therefore, that "Custody" put his life in danger by housing him with another co-defendant. Id. However, the evidence submitted by Defendants shows that Plaintiff named only two co-defendants, i.e., Zachary Wuester and Gary Fitzgerald, with whom he could not be housed. See supra at 3. There is no evidence that Plaintiff stated generally to any member of the MCJ staff that he did not want to be housed with other unknown co-defendants, nor does he so allege. Id. Furthermore, Plaintiff states that neither he nor Mr. Mohamed knew each other when they were placed together, and the fact that they were co-defendants in the same murder case only came to light when Mr. Mohamed went through Plaintiff's legal mail. Id. at 5. At that point, Mr. Mohamed immediately requested a move because he believed *his* life was in danger. Id. at 5-6. Accordingly, there is no evidence that Plaintiff was facing a substantial risk of suffering serious harm at the hands of Mr. Mohamed who, according to Plaintiff, was not even aware of their involvement in the same murder investigation during the entire time they were housed together. Because Plaintiff has not established the existence of a substantial risk under the second element, he cannot establish the third element, i.e., that Defendants failed to take reasonable available measures to abate that risk. Plaintiff repeatedly states in opposition that contrary to Defendants' assertion, he never asked to cell with Mr. Mohamed, Dkt. No. 39 at 4-5, but nowhere in Defendants' papers do they assert that this was the case. They only assert that Plaintiff requested to be put in the same shower group with Mr. Mohamed after they were no longer cellmates. See supra at 4. Lastly, Plaintiff has failed to establish that he suffered any injuries under the fourth element, due to Defendants' failure to take reasonable measures. Indeed, there were no reports of any altercations or conflict between Plaintiff and Mr. Mohamed while they were housed together, and Plaintiff reported that they got along. Id. at 4. Moreover, Mr. Mohamed requested and was granted an in immediate cell move once he found out that he and Plaintiff were co-defendants. Accordingly, it cannot be said that Defendants acted with a reckless disregard to a known danger to either Plaintiff or Mr. Mohamed. See

15

Castro, 833 F.3d at 1071.

With respect to Plaintiff's allegation that Defendants later *attempted* to house him with co-defendants Mr. Mohamed and Mr. Blank, such actions do not establish to a failure to protect claim because Plaintiff was never actually housed with these co-defendants and therefore not placed in substantial risk of suffering serious harm. Nor can it be said that a reasonable officer in Defendants' position would have believed that merely asking Plaintiff to share a cell with a co-defendant would place Plaintiff in danger. Lastly, there is no indication that Plaintiff was ever forced to house with Mr. Mohamed or put in the same shower group after MCJ was put on notice that Mr. Mohamed had allegedly placed a "hit" on Plaintiff sometime in November 2018. See supra at 6.

Based on the foregoing, Defendants have established the absence of a genuine issue of material fact with respect to the failure to protect claim based on Plaintiff's housing with co-defendant Mr. Mohamed. See Celotex Corp., 477 U.S. at 323. In response, Plaintiff has failed to identify with reasonable particularity any evidence that precludes summary judgment against any named Defendant. See Keenan, 91 F.3d at 1279. Accordingly, Defendants are entitled to summary judgment on this claim. Id.; see Celotex Corp., 477 U.S. at 323.

### 2. Housing with Mr. Silver

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine dispute as to any material fact relating to Plaintiff's claim that Defendants failed to protect him when they housed him with Mr. Silver. There is no dispute with respect to the first element, i.e., that Defendants made an intentional decision to house Plaintiff with Mr. Caleb. Although Defendants assert that Plaintiff agreed to the housing assignment, the Court will view the evidence in the light most favorable to Plaintiff and assume the assignment was against his wishes. With respect to the second element, Plaintiff asserts that housing him with Mr. Silver placed him at substantial risk of serious harm because Mr. Silver was a convicted murderer and had a reputation for

16

fighting.  See supra at 3.  But according to Defendants, both Mr. Silver and Plaintiff were being held on murder charges, and neither inmate was convicted for most of the time they were housed together.  Id. at 6.  Other than his conclusory allegation that Mr. Silver was "violent," Plaintiff sets forth no evidence establishing the existence of a legitimate concern for his safety by which a reasonable officer would believe that housing Plaintiff with Mr. Silver would place him at a substantial risk of suffering serious harm.  Furthermore, although Plaintiff claims that he had to defend himself from being battered "9 times" by Mr. Caleb, he provides no description of these alleged assaults or any evidence of their occurrence, e.g., incident reports, inmate requests, or grievances.  Id. at 3.  Rather, the evidence submitted by Defendants shows that Plaintiff consistently expressed that the two got along well.  Id.  Moreover, the evidence shows that there was only one reported altercation between the two in June 2018, which was after they had been housed together for ten months.  Id. at 6.  Both inmates described the incident as merely roughhousing, and neither requested to be moved.  Id.  Accordingly, it cannot be said that a reasonable officer in these circumstances would have believed that Plaintiff was facing a substantial risk of serious harm which required that he be separated from Mr. Silver.

      Lastly, Plaintiff alleges that Mr. Silver told him on August 21, 2017, that he had been paid by Mr. Mohamed to "stab" Plaintiff but had welched on the deal.  See supra at 6.  Nowhere does Plaintiff allege that he told Defendants what Mr. Silver had disclosed to him or that any Defendant was otherwise made aware of this arrangement and failed to act.  Rather, even after Mr. Silver made this disclosure, the two inmates remained housed together without incident for nearly a year thereafter.  Nor is there any evidence that their roughhousing in June 2018 was linked to the alleged arrangement between Mr. Silver and Mr. Mohamed from 10 months prior.  Accordingly, there is no evidence that any injuries Plaintiff suffered during this altercation, *i.e.*, a cut on his knuckle, were caused by Defendants' failure to take reasonable measures to abate a high risk of which a reasonable officer in the circumstances would have been aware.

Based on the foregoing, Defendants have established the absence of a genuine issue of material fact with respect to the failure to protect claim based on Plaintiff's housing with Mr. Silver. See Celotex Corp., 477 U.S. at 323. In response, Plaintiff has failed to identify with reasonable particularity any evidence that precludes summary judgment against any named Defendant. See Keenan, 91 F.3d at 1279. Accordingly, Defendants are entitled to summary judgment on this claim. Id.; see Celotex Corp., 477 U.S. at 323.

### 3. Altercation with Mr. Burleigh

Plaintiff claims that Defendants failed to protect him from an assault by Mr. Burleigh when they disregarded his concerns about being in the same shower group and failed to move him. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that there is no genuine dispute as to any material fact relating to this claim.

According to Plaintiff, he informed Defendants Leon, Case, and Johnston on July 9, 2017, about a potential altercation with Mr. Burleigh if they remained in the same shower group. Dkt. No. 1-1 at 1. In his opposition, Plaintiff claims he spoke to them on July 11, 2017, the day before the incident. Dkt. No. 39 at 6. However, the evidence submitted by Defendants indicates that on that same day, Plaintiff reported that the two were getting along. Siderakis Decl., Dkt. No. 29-1 at 17. Plaintiff does not contest the reliability of this report prepared by Defendant Siderakis. If Plaintiff told Defendants about his concerns on July 9, 2017, then his report two days later to Defendant Siderakis that he was getting along with Mr. Burleigh would have negated any concerns that were raised by Plaintiff's earlier statements. But if Plaintiff informed them on July 11, 2017, then it is possible that he voiced his concerns *after* his classification interview with Defendant Siderakis earlier that day. Viewing the evidence in the light most favorable to Plaintiff, the Court will consider the claim in this latter context.

Plaintiff claims he informed Defendants that Mr. Burleigh "would frequently make hostile or 'off the wall' remarks regarding [his] case." Dkt. No. 39 at 6. Plaintiff claims he told Defendant Leon that he "did not want to get in an altercation with inmate

18

Burleigh," and Defendant Leon responded, "I don't know Wells, I'd kinda like to see that fight." Dkt. No. 20 at 2; Dkt. No. 39 at 6-7. According to Defendant Leon, he never told Plaintiff that he would like to see him fight Burleigh, and that nothing Plaintiff said caused Defendant Leon to be concerned for Plaintiff's safety. Leong Decl. ¶ 2. Even assuming Plaintiff's version is true, he has not established that Defendant Leon's failure to take his concerns seriously was objectively unreasonable. Plaintiff merely expressed concern that he might get into a fight with Mr. Burleigh for saying hostile and "off the wall" remarks. Plaintiff does not explain how or why Mr. Burleigh's remarks about his case were hostile or why such remarks should have led Defendants to believe that Mr. Burleigh might harm Plaintiff. Plaintiff did not state that Mr. Burleigh had specifically threatened to harm him such that Plaintiff feared for his safety. Furthermore, the two had no history of conflict, and Plaintiff had recently reported getting along with Mr. Burleigh. Under these circumstances, it cannot be said that a reasonable officer in Defendant Leon's position would have believed that keeping Plaintiff and Mr. Burleigh in the same shower group meant putting Plaintiff at a substantial risk of suffering serious harm. The same is true of Defendant Case whom Plaintiff claims told him to "tell the sgt. when he or she comes around." Dkt. No. 20 at 2; Dkt. No. 39 at 7. Assuming this is true, it cannot be said that Defendant Case's response was objectively unreasonable when he directed Plaintiff to share his concerns with a supervising officer who was expected to "come around" that very night. By doing so, Defendant Case was not disregarding any risk to Plaintiff. Then in accordance with Defendant Case's instruction, Plaintiff told Defendant Sgt. Johnston later that evening of his concerns about being in the same shower group with Mr. Burleigh due to his "hostile remarks about my case and my fears." Dkt. No. 20 at 3; Dkt. No. 39 at 7. As Defendants point out in reply, Plaintiff does not explain what fears he told Defendant Johnston about, nor does he say those fears were related to Mr. Burleigh. Dkt. No. 40 at 4. According to Plaintiff, Defendant Johnston responded "with a shrug of his shoulders and said, 'Ignore him,' as he walked away." Dkt. No. 39 at 7. Defendant Johnston's statement

that Plaintiff should ignore Mr. Burleigh implied that he believed Plaintiff should not allow himself to be provoked by Mr. Burleigh's remarks rather than a belief that Mr. Burleigh presented a legitimate safety concern to Plaintiff which Defendant Johnston chose to disregard. As discussed above, Plaintiff had no history of conflict with Mr. Burleigh, and he had recently reported that they were getting along. See supra at 19. Accordingly, it cannot be said that a reasonable officer in Defendant Johnston's position under these circumstances would have believed that Plaintiff was facing a substantial risk of serious harm by being in the same shower group with Mr. Burleigh the next day.

Based on the foregoing, Defendants have established the absence of a genuine issue of material fact with respect to the failure to protect involving Mr. Burleigh. See Celotex Corp., 477 U.S. at 323. In response, Plaintiff has failed to identify with reasonable particularity any evidence that precludes summary judgment against any named Defendant. See Keenan, 91 F.3d at 1279. Accordingly, Defendants are entitled to summary judgment on this claim. Id.; see Celotex Corp., 477 U.S. at 323.

## CONCLUSION

For the reasons stated above, Defendants Sgt. Siderakis, Sgt. Johnston, Deputy Grant, Capt. Timothy Pearce, Sgt. Saye, Deputy Leon, and Deputy Case's motion for summary judgment is **GRANTED**. Dkt. No. 29. The failure to protect claims against them are **DISMISSED** first for failure to exhaust administrative remedies and second **DISMISSED with prejudice** due to the absence of a genuine issue of material fact.

The Clerk shall terminate any pending motions and close the case.

This order terminates Docket No. 29.

**IT IS SO ORDERED.**

Dated: 3/18/2021

EDWARD J. DAVILA
United States District Judge

Order Granting MSJ
PRO-SE\EJD\CR.19\01345Wells_grant-msj(exh&merits)